LAWYERS FOR CLEAN WATER, INC.
Drevet Hunt (Bar No. 240487)
        Email: drev@lawyersforcleanwater.com
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone:  (415) 440-6520
Facsimile:  (415) 440-4155

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>LIBERTY METALS RECYCLING, INC., a California corporation; SINDY CARDONA, an individual; LUDIN ARREAGA, an individual; and KENDER ARREAGA, an individual;<br><br>        Defendants. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Complaint

Los Angeles Waterkeeper ("Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.        JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On 9 March 2015, Waterkeeper issued a sixty (60) day notice of intent to sue ("Notice Letter") to Liberty Metal Recycling, Inc., Sindy Cardona, Ludin Arreaga, and Kender Arreaga (collectively "Defendants"). The Notice Letter informed the Defendants of their violations of the California General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter also informed Defendants of Waterkeeper's intent to file suit against them to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was sent to the registered agent for Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendants and the state and federal agencies. Plaintiff is informed and believes, and

1  thereon alleges, that neither the EPA nor the State of California has commenced or is
2  diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33
3  U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty
4  under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

5      5.     Venue is proper in the Central District of California pursuant to Section
6  505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the
7  violations are located within this judicial district.

8      6.     Defendants' violations of the procedural and substantive requirements of the
9  Storm Water Permit and the Clean Water Act alleged in this Complaint are ongoing and
10  continuous.

11  **II.     INTRODUCTION**

12      7.     This Complaint seeks relief for Defendants' substantive and procedural
13  violations of the Storm Water Permit and the Clean Water Act resulting from
14  Defendants' operations at 5535 Alba Street, Los Angeles, California 90058 ("Liberty
15  Facility" or "Facility").

16      8.     With every storm event, hundreds of millions of gallons of polluted
17  rainwater, originating from industrial operations such as the Liberty Facility, pour into
18  Los Angeles area waters. The consensus among agencies and water quality specialists is
19  that storm water pollution accounts for more than half of the total pollution entering
20  marine and river environments each year. Los Angeles area waters are ecologically
21  sensitive areas and are essential habitat for dozens of fish and bird species as well as
22  macro-invertebrate and invertebrate species. Storm water and non-stormwater
23  contaminated with sediment, heavy metals, and other pollutants harm the special
24  aesthetic and recreational significance that Los Angeles area waters have for people in
25  the surrounding communities. The public's use of Los Angeles area waters for water
26  contact sports exposes many people to toxic metals and other contaminants in storm
27  water and non-stormwater discharges. Non-contact recreation and aesthetic opportunities,
28  such as wildlife observation, are also impaired by polluted discharges into Los Angeles

Complaint                                3

1    area waters.

2    **III.     PARTIES**

3         **A.     Los Angeles Waterkeeper.**

4         9.     Los Angeles Waterkeeper is a non-profit public benefit corporation

5    organized under the laws of the State of California with its office at 120 Broadway, Suite

6    105, Santa Monica, California 90401.

7         10.     Founded in 1993, Waterkeeper has approximately 3,000 members who live

8    and/or recreate in and around the Los Angeles area. Waterkeeper is dedicated to the

9    preservation, protection, and defense of the environment, wildlife, and natural resources

10   of rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution

11   and degradation. To further this mission, Waterkeeper actively seeks federal and state

12   implementation of the Clean Water Act. When necessary, Waterkeeper directly initiates

13   enforcement actions on behalf of itself and its members.

14        11.     Waterkeeper's members use and enjoy the waters into which Defendants

15   discharge polluted storm water. These waters include Compton Creek, Los Angeles

16   River, Los Angeles River Estuary, Los Angeles/Long Beach Harbor, San Pedro Bay,

17   Long Beach City Beach, and the Pacific Ocean (collectively "Receiving Waters").

18   Waterkeeper's members use and enjoy the Receiving Waters for fishing, boating, wading,

19   swimming, diving, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking,

20   biking, engaging in scientific study, monitoring the watershed, and/or conducting

21   watershed restoration.

22        12.     Discharges of polluted storm water from the Liberty Facility degrade water

23   quality, harm aquatic life in the Receiving Waters, and impair Waterkeeper's members'

24   use and enjoyment of the Receiving Waters.

25        13.     Defendants' polluted discharges from the Liberty Facility are ongoing and

26   continuous. Thus, the interests of Waterkeeper's members have been, are being, and will

27   continue to be adversely affected by Defendants' failure to comply with the Clean Water

28   Act and the Storm Water Permit.

**B.     The Liberty Facility Owners and/or Operators.**

14.     Waterkeeper is informed and believes, and thereon alleges, that Liberty Metals Recycling, Inc., is an operator of the Liberty Facility.

15.     Waterkeeper is informed and believes, and thereon alleges, that Liberty Metals Recycling, Inc., has operated the Liberty Facility since at least 23 August 2011.

16.     Waterkeeper is informed and believes, and thereon alleges, that Liberty Metals Recycling, Inc., is an owner of the Liberty Facility.

17.     Waterkeeper is informed and believes, and thereon alleges, that Liberty Metals Recycling, Inc., has owned the Liberty Facility since at least 23 August 2011.

18.     Waterkeeper is informed and believes, and thereon alleges, that Liberty Metals Recycling, Inc., is an active corporation registered in California.

19.     Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona is an owner of Liberty Metals Recycling, Inc.

20.     Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona has owned Liberty Metals Recycling, Inc., since at least 1 September 2011.

21.     Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga is an owner of Liberty Metals Recycling, Inc.

22.     Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga has owned Liberty Metals Recycling, Inc., since at least 20 April 2012.

23.     Waterkeeper is informed and believes, and thereon alleges, that the Registered Agent for Liberty Metals Recycling, Inc., is Ludin Arreaga, 5535 Alba Street, Los Angeles, California 90058.

24.     Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona is an operator of the Liberty Facility.

25.     Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona has operated the Liberty Facility since at least 1 September 2011.

26.     Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona is an owner of the Liberty Facility.

27.    Waterkeeper is informed and believes, and thereon alleges, that Sindy Cardona has owned the Liberty Facility since at least 1 September 2011.

28.    Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga is an operator of the Liberty Facility.

29.    Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga has operated the Liberty Facility since at least 1 September 2011.

30.    Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga is an owner of the Liberty Facility.

31.    Waterkeeper is informed and believes, and thereon alleges, that Ludin Arreaga has owned the Liberty Facility since at least 1 September 2011.

32.    Waterkeeper is informed and believes, and thereon alleges, that Kender Arreaga is an operator of the Liberty Facility.

33.    Waterkeeper is informed and believes, and thereon alleges, that Kender Arreaga has operated the Liberty Facility since at least 8 May 2014.

34.    Waterkeeper refers to Liberty Metals Recycling, Inc., Sindy Cardona, Ludin Arreaga, and Kender Arreaga collectively as the "Liberty Facility Owners and/or Operators."

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act and California Storm Water Permit.

35.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(b).

36.    Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), establishes a framework for regulating industrial storm water discharges under the NPDES permit program.

37.    Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), allows each

Complaint                                    6

state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide, general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b); 33 U.S.C. § 1342(b) § 1342(p).

38.    California is a state authorized by the EPA to issue NPDES permits.

39.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act. *See* Storm Water Permit, Finding No. 15.

40.    In order to discharge storm water lawfully in California, industrial storm water dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

41.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section C(1).

42.    Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

43.    Each of the Receiving Waters is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a).

44.    Liberty Metals Recycling, Inc., is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

45.    Sindy Cardona is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

46.    Ludin Arreaga is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

47.     Kender Arreaga is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

48.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

49.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day for violations occurring after 12 January 2009. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

50.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     Effluent Limitation B(3) of the Storm Water Permit.**

51.     Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform, among others.

52.     EPA's NPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity ("MSGP") sets numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

53.     The EPA Benchmarks provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* MSGP Fact Sheet, at 95 (2008), *available at* http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

54.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

C.     **Receiving Water Limitations C(1) and C(2) of the Storm Water Permit.**

55.     Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges that adversely impact human health or the environment.

56.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

57.     Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that "cause or contribute to an exceedance of any applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

58.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and/or the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the *Water Quality Control Plan, Los Angeles Region (Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties)*, California Regional Water Quality Control Board, Los Angeles Region (4) (adopted June 13, 1994, as amended) ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

60.     The CTR includes numeric criteria set to protect human health and the environment in the state of California.[1]

---

[1] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

61.    The Basin Plan identifies the "Beneficial Uses" of water bodies in the Los Angeles region.

62.    The Beneficial Uses for the Los Angeles River Watershed, which receives polluted storm water discharges from the Liberty Facility, include water contact recreation (REC 1), non-contact water recreation (REC 2), warm freshwater habitat (WARM), ground water recharge (GWR), wildlife habitat (WILD), wetland (WET), estuarine habitat (EST), industrial service supply (IND), navigation (NAV), marine habitat (MAR), commercial fishing (COMM), rare, threatened, or endangered (RARE), migration of aquatic organisms (MIGR), and spawning, reproduction and/or early development (SPWN). *See* Basin Plan, Table 2-1.

63.    A surface water that cannot support its Beneficial Uses listed in the Basin Plan is designated as an impaired water body pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

64.    Waterkeeper is informed and believes, and thereon alleges, that discharges of pollutants at levels above WQS, including the CTR, contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

65.    The Compton Creek is impaired by coliform bacteria, copper, lead, trash and pH. *See* 2010 Integrated Report – All Assessed Waters, available at: http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml.

66.    Reaches 1 and 2 of the Los Angeles River are impaired by pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil. *Id.*

67.    The Los Angeles River Estuary is impaired by chlordane, sediment toxicity, and trash. *Id.*

68.    The Los Angeles/Long Beach Harbor is impaired by chrysene, copper, sediment toxicity, and zinc. *Id.*

69.    The San Pedro Bay is impaired by sediment toxicity. *Id.*

70.    The Long Beach City Beach, one of the San Pedro Bay beaches, is impaired

by indicator bacteria. *Id.*

71.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

72.     Discharges with elevated levels of pollutant are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

**D.     The Storm Water Permit's NOI Requirements.**

73.     Provision E(1) of the Storm Water Permit requires all facility operators seeking coverage by the Storm Water Permit to submit an NOI for each of the facilities they operate.

74.     Provision E(1) of the Storm Water Permit requires facility operators filing an NOI after 17 April 1997 to use the NOI instructions at Attachment 3 of the Storm Water Permit ("NOI Instructions").

75.     The NOI Instructions require facility operators to enter the total size of the facility (Part C) and identify Standard Industrial Classification ("SIC") codes that represent the industrial activities taking place at the facility (Part D). Storm Water Permit, Attachment 3, NOI Instructions.

**E.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

76.     Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit prior to commencing industrial activities.

77.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

78.    Section A(3) of the Storm Water Permit requires a discharger to identify the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing and revising the SWPPP so as to ensure compliance with the Storm Water Permit.

79.    Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains, among other requirements: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance, and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

80.    Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

81.    Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, potential pollutants that could be discharged in storm water discharges, and all non-stormwater discharges.

82.    Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

83.    Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants

1   are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water

2   Permit requires that the SWPPP include a summary of the areas of the facility that are

3   likely sources of pollutants and the corresponding pollutants likely to be present in storm

4   water discharges.

5          84.    Section A(8) of the Storm Water Permit requires that the SWPPP include a

6   narrative description of the storm water BMPs to be implemented at the facility for each

7   potential pollutant and its source. BMPs shall be developed and implemented to reduce or

8   prevent pollutants in storm water discharges. Storm Water Permit, Section A(8).

9   Dischargers must develop and implement structural and/or non-structural BMPs. *Id*.

10         85.    Section A(9) of the Storm Water Permit requires that the discharger evaluate

11  the SWPPP on an annual basis and revise it as necessary to ensure compliance with the

12  Storm Water Permit.

13         86.    Sections A(9)(a)-(c) of the Storm Water Permit require that the discharger

14  conduct an annual comprehensive site compliance evaluation that includes a review of all

15  visual observation records, inspection reports, and sampling and analysis results; a visual

16  inspection of all potential pollutant sources for evidence of, or the potential for, pollutants

17  entering the drainage system; a review and evaluation of all BMPs to determine whether

18  the BMPs are adequate, properly implemented and maintained, or whether additional

19  BMPs are needed; and a visual inspection of equipment needed to implement the

20  SWPPP.

21         87.    Section A(9)(d) of the Storm Water Permit requires that the discharger

22  submit an evaluation report that includes identification of personnel performing the

23  evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for

24  implementing SWPPP revisions, any incidents of non-compliance and the corrective

25  actions taken, and certification that the discharger is in compliance with the Storm Water

26  Permit. If certification of compliance cannot be provided, the discharger must explain in

27  the evaluation report why the facility is not in compliance with the Storm Water Permit.

28  Storm Water Permit, Section A(9)(d). The evaluation report shall be submitted as part of

Complaint                          13

1  the Annual Report, which is specified in Section B(14) of the Storm Water Permit. Storm
2  Water Permit, Section B(14).

3      88.    Section A(10) of the Storm Water Permit requires that the discharger revise
4  the SWPPP as necessary prior to changes in industrial activities, or as otherwise required
5  by the Storm Water Permit.

6      **F.    The Storm Water Permit's Monitoring and Reporting Requirements.**

7      89.    Section B(1) and Provision E(3) of the Storm Water Permit require
8  dischargers to develop and implement a Monitoring and Reporting Program ("M&RP")
9  prior to commencing industrial activities.

10     90.    The objectives of the M&RP are to confirm that BMPs have been adequately
11 developed and implemented such that storm water and non-stormwater discharges
12 comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and
13 Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

14     91.    The M&RP aids in the implementation and revision of the SWPPP and
15 measures the effectiveness of BMPs to prevent or reduce pollutants in storm water
16 discharges. Storm Water Permit, Sections B(2)(c) and B(2)(d).

17     92.    Section B(2)(d) of the Storm Water Permit requires that the M&RP "shall be
18 revised" as necessary to ensure compliance with the Storm Water Permit.

19     93.    Section B(3) of the Storm Water Permit requires a discharger to conduct
20 visual observations of all drainage areas within the facility for the presence of authorized
21 and unauthorized non-stormwater discharges. Observations under this section must occur
22 during daylight hours, on days with no storm water discharges, and during scheduled
23 facility operating hours. Storm Water Permit, Sections B(3).

24     94.    Section B(4) of the Storm Water Permit requires a discharger to conduct
25 visual observations of storm water discharges during the first hour of discharge, at each
26 discharge point, of at least one storm event per month during October 1 – May 30 ("Wet
27 Season"). Observations under this section must take place during daylight hours, on days
28 when the discharge is preceded by at least three (3) days without storm water discharges,

Complaint                                14

1   and during scheduled facility operating hours. Storm Water Permit, Section B(4).

2      95.   Visual observations conducted under Sections B(3) and B(4) of the Storm

3   Water Permit must be recorded. Storm Water Permit, Sections B(3)(d) and B(4)(c).

4   Records of observations must describe the presence of any floating or suspended

5   materials, O&G, discolorations, turbidity, odor, and the source of any pollutants observed

6   during the visual observation. *Id*. Dischargers must maintain records of visual

7   observations that include the observation date, locations observed, and responses taken to

8   eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants

9   from contacting non-stormwater and storm water discharges. *Id*. Furthermore, Sections

10   B(3) and B(4) require a discharger to revise a facility's SWPPP in order to rectify any

11   instances of noncompliance observed during visual observations. *Id*.

12      96.   Sections B(5) and B(7) of the Storm Water Permit require dischargers to

13   visually observe and collect samples of storm water discharges from all locations where

14   storm water is discharged.

15      97.   Section B(5)(a) of the Storm Water Permit requires dischargers to collect

16   storm water samples during the first hour of discharge. Samples of storm water

17   discharges must be collected from the first storm event of the Wet Season and at least one

18   other storm event in the Wet Season. Storm Water Permit, Section B(5)(a). All storm

19   water discharge locations must be sampled. *Id*.

20      98.   Facility operators that do not collect samples from the first storm event of

21   the Wet Season are still required to collect samples from two other storm events during

22   the Wet Season, and must explain in the Annual Report why the first storm event was not

23   sampled. *Id.*

24      99.   Section B(5)(b) requires that sampling conducted pursuant to the Storm

25   Water Permit occur during scheduled facility operating hours on days that are preceded

26   by at least three (3) working days without storm water discharge.

27      100.   Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze

28   each sample for pH, specific conductance ("SC"), TSS, and O&G. A discharger may

Complaint           15

substitute analysis for total organic carbon ("TOC") instead of O&G.

101.   Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in the storm water discharged from the facility in significant quantities.

102.   Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities classified as SIC code 5093 to analyze storm water samples for iron, lead, aluminum, zinc, copper, and Chemical Oxygen Demand ("COD").

103.   Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities classified as SIC code 4953 to analyze storm water samples for ammonia, magnesium, arsenic, cadmium, cyanide, mercury, selenium, and silver.

104.   Section B(5)(c)(iv) of the Storm Water Permit requires dischargers to analyze each sample for all parameters as required by the Regional Board.

105.   Section B(14) of the Storm Water Permit requires dischargers to submit an Annual Report to the applicable regional board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9) of the Storm Water Permit, an explanation of why a facility did not implement any required activities, and other records specified in Section B(13) of the Storm Water Permit. Storm Water Permit, Section B(14).

106.   Section C(9) of the Storm Water Permit requires that all reports, certifications, or other information required by the Storm Water Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators.

107.   Section C(10) of the Storm Water Permit requires any signatory subject to Section C(9) to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and

1  evaluate the information submitted. Based on my inquiry of the person or persons who
2  manage the system, or those persons directly responsible for gathering the information,
3  the information submitted is to the best of my knowledge and belief, true, accurate, and
4  complete. I am aware that there are significant penalties for submitting false information,
5  including the possibility of fine and imprisonment for knowing violations."

6  108. Section C(11)(d) of the Storm Water Permit requires facility operators to
7  report any incidence of noncompliance with the Storm Water Permit at the time
8  monitoring reports are submitted. Reports of noncompliance must contain (1) a
9  description of noncompliance and its cause, (2) the period of noncompliance, including
10  exact dates and times, and if the noncompliance has not been corrected, the anticipated
11  time it is expected to continue, and (3) steps taken or planned to reduce and prevent
12  recurrence of the noncompliance. Storm Water Permit, Section C(11)(d).

13  **V.    FACTUAL BACKGROUND**

14      **A.    Facility Site Description.**

15  109. Waterkeeper is informed and believes, and thereon alleges, that the Liberty
16  Facility Owners and/or Operators conduct industrial operations for Liberty Metals
17  Recycling, Inc., at 5535 Alba Street, Los Angeles, California 90058.

18  110. Waterkeeper is informed and believes, and thereon alleges, that the Liberty
19  Facility is bordered by 57th Street on the south, Alba Street on the east, and private
20  property on the west and north.

21  111. Waterkeeper is informed and believes, and thereon alleges, that the Liberty
22  Facility has one driveway at 57th Street.

23  112. Waterkeeper is informed and believes, and thereon alleges, that the Liberty
24  Facility has three driveways at Alba Street.

25      **B.    The Liberty Facility's Storm Water Permit Coverage.**

26  113. On or about 20 April 2012, the Liberty Facility Owners and/or Operators
27  submitted a Notice of Intent to Comply with the Terms of the General Permit to
28  Discharge Storm Water Associated with Industrial Activity ("Liberty NOI") for the

Complaint                              17

1  Liberty Facility.

2      114.   The State Board confirmed receipt of the Liberty NOI for the Liberty

3  Facility on 9 May 2012 ("NOI Receipt").

4      115.   The Liberty NOI identifies the operator of the Liberty Facility as "Ludin

5  Arreaga."

6      116.   The Liberty NOI identifies the Facility name and location as "Liberty Metals

7  Recycling, Inc., 5535 Alba Street, Los Angeles, CA, 90058."

8      117.   The State Board's electronic database, called the Storm Water Multiple

9  Application & Report Tracking System ("SMARTS"),[2] identifies the Facility operator

10 and address as "Liberty Metals Recycling Inc, 5535 Alba St Los Angeles California,

11 90058."

12     118.   SMARTS identifies the Facility name and address as "Liberty Metals

13 Recycling Inc, 5535 Alba St Los Angeles California, 90058."

14     119.   SMARTS lists the Liberty Facility's coverage under the Storm Water Permit

15 as "Active."

16     120.   The NOI Receipt and SMARTS list the Liberty Facility Waste Discharge

17 Identification ("WDID") number as 4 19I023630.

18     121.   The Liberty NOI lists the SIC code for the Liberty Facility as 5093.

19     122.   The Liberty NOI lists the total size of the Facility as 24,564 square feet.

20     123.   The Liberty Facility's Storm Water Pollution Prevention Plan, signed by

21 Ludin Arreaga on 20 May 2014, ("Liberty SWPPP") Facility Map ("Liberty Site Map")

22 states that the size of the Facility is 55,200 square feet.

23     **C.     Defendant's SWPPP and M&RP for the Liberty Facility.**

24     124.   Waterkeeper is informed and believes, and thereon alleges, that on or about

25 3 June 2014, the Liberty Facility Owners and/or Operators submitted to the Regional

26 Board a copy of the Liberty SWPPP.

27     125.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

28

[2] Available at http://smarts.waterboards.ca.gov/.

SWPPP is the Liberty Facility's current SWPPP.

**D.    Industrial Activities at the Liberty Facility.**

126.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility's industrial activities and areas of industrial activity are pollutant sources.

127.   Waterkeeper is informed and believes, and thereon alleges, that the following industrial activities are conducted at the Liberty Facility: unloading, sorting, temporary storage, weighing, processing, dismantling, and transfer of metal scraps as well as tires, batteries, alternators, motors, catalytic converters, radiators, water heaters, refrigerators, other household and commercial equipment and/or parts that contain residual solid and liquid contaminants, and a variety of other materials; receipt and storage of hazardous waste; vehicle and equipment storage.

128.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct unloading, sorting, processing, dismantling, weighing, and temporary storage of metal scraps as well as tires, batteries, alternators, motors, catalytic converters, radiators, water heaters, refrigerators, other household and commercial equipment and/or parts that contain residual solid and liquid contaminants, and a variety of other materials in the southern half of the Facility, near the Facility's driveway at 57th Street and southernmost driveway at Alba Street.

129.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct unloading, sorting, processing, dismantling, weighing, and temporary storage of metal scraps as well as tires, batteries, alternators, motors, catalytic converters, radiators, water heaters, refrigerators, other household and commercial equipment and/or parts that contain residual solid and liquid contaminants, and a variety of other materials in the southern portion of the Facility, immediately adjacent to the Facility's eastern fence line bordering Alba Street.

130.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct sorting, processing, dismantling, and temporary storage of metal scraps as well as tires, batteries, alternators, motors, catalytic

converters, radiators, water heaters, refrigerators, other household and commercial equipment and/or parts that contain residual solid and liquid contaminants, and a variety of other materials in the Outdoor Work Area located at the north end of the Facility, near the Facility's northernmost driveway at Alba Street.

131.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct sorting, processing, dismantling, and temporary storage of metal scraps as well as tires, batteries, alternators, motors, catalytic converters, radiators, water heaters, refrigerators, other household and commercial equipment and/or parts that contain residual solid and liquid contaminants, and a variety of other materials near the Facility's center driveway at Alba Street, in the Facility's southernmost covered structure.

132.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct vehicle and equipment storage in the southern half of the Facility, near the Facility's driveway at 57th Street and southernmost driveway at Alba Street.

133.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators conduct vehicle and equipment storage in the Outdoor Work Area of the Facility, near the Facility's northernmost driveway at Alba Street.

134.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility receives and stores hazardous waste at the Facility, including vehicle waste fluids.

135.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility stores hazardous waste, including vehicle waste fluids, in barrels stored outdoors without overhead coverage or secondary containment, near the Facility's northernmost driveway at Alba Street.

136.   Waterkeeper is informed and believes, and thereon alleges, that industrial activities at the Liberty Facility are conducted outdoors and without adequate cover or other measures to prevent the exposure of industrial activities to rainfall.

137.   Waterkeeper is informed and believes, and thereon alleges, that industrial activities at the Liberty Facility are conducted outdoors without secondary containment or other measures to prevent polluted storm water from discharging from the Facility.

138.   Waterkeeper is informed and believes, and thereon alleges, that materials associated with industrial activities at the Liberty Facility are stored near driveways and other discharge points at the Liberty Facility.

139.   Waterkeeper is informed and believes, and thereon alleges, that materials associated with industrial activities at the Liberty Facility, such as tires, trash, and rodenticide are dispersed beyond the Facility's boundaries, onto adjacent sidewalks.

140.   Waterkeeper is informed and believes, and thereon alleges, that O&G, trash, debris, and other pollutants, including metals and pathogens, have been and continue to be tracked throughout the Liberty Facility.

141.   Waterkeeper is informed and believes, and thereon alleges, that trucks and vehicles leaving the Liberty Facility via driveways are pollutant sources tracking sediment, dirt, O&G, metal particles, trash, debris, and other pollutants off the Facility.

142.   Waterkeeper is informed and believes, and thereon alleges, that sources of pollutants at the Liberty Facility include: outdoor material handling and storage areas; outdoor material processing areas; indoor handling, storage, and processing areas near the Facility's driveways; metal structures; loose piles of waste and recyclable materials; uncovered roll-off bins, dumpsters, and other containers; vehicle and equipment storage areas; hazardous waste storage areas; loading and unloading areas; areas with vehicle and equipment traffic and associated track-off of pollutants; on-site material handling equipment; other industrial equipment; and loose piles of rodenticide.

143.   Waterkeeper is informed and believes, and thereon alleges, that the pollutants associated with operations at the Liberty Facility include, but are not limited to: trash; recyclable materials; fugitive and other dust, dirt, and debris; metals such as aluminum, copper, iron, lead, and zinc; mercury; O&G; pathogens (including bacteria); pH-affecting substances; antifreeze; brake fluid; transmission fluid; lubrication fluids;

solvents and cleaners; fuels and fuel additives; and TSS.

144.   Waterkeeper is informed and believes, and thereon alleges, that pollutants accumulate on the Liberty Facility at material handling, storage, sorting, and processing areas; hazardous waste storage area; vehicle and equipment storage areas; loading and unloading areas; the driveways leading onto 57th Street and Alba Street; and the surrounding sidewalks and municipal streets themselves, including 57th Street and Alba Street.

145.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the Liberty Facility, in violation of the Storm Water Permit and the Clean Water Act.

146.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs sufficient to reduce or prevent pollutants in storm water discharged from the Liberty Facility, as required by the Storm Water Permit and the Clean Water Act.

147.   The failure to properly address pollutants and their sources results in the discharge of pollutants from the Liberty Facility in violation of the Storm Water Permit and the Clean Water Act.

   **E.   Storm Water Discharges at the Liberty Facility.**

148.   The Liberty Facility Owners and/or Operators state in the Liberty SWPPP that the Facility has two discharge points located at the "Northwest Gate" and "Southeast Gate."

149.   The Liberty Site Map does not depict any gates or discharge points in the northwest portion of the Facility.

150.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP inaccurately states that the Liberty Facility has a discharge point in the northwestern portion of the Facility.

151.   The Liberty Site Map does not depict any gate or discharge points in the

southeast portion of the Facility.

152.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP inaccurately states that the Liberty Facility has a discharge point at a gate in the southeastern portion of the Facility.

153.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility has at least two discharge points.

154.   Waterkeeper is informed and believes, and thereon alleges, that Discharge Point No. 1 is located at the Facility's southernmost driveway at Alba Street.

155.   Waterkeeper is informed and believes, and thereon alleges, that Discharge Point No. 2 is from a point underneath the Facility's eastern wall bordering Alba Street, south of the Facility's southernmost driveway on Alba Street.

156.   Waterkeeper is informed and believes, and thereon alleges, that Discharge Point No. 1 receives storm water flows from the entire Facility.

157.   Waterkeeper is informed and believes, and thereon alleges, that Discharge Point No. 2 receives storm water flows from the southern half of the Facility.

158.   Waterkeeper is informed and believes, and thereon alleges, that Discharge Point Nos. 1 and 2 flow to the Los Angeles area municipal separate storm sewer system, which carries the discharges from the Liberty Facility to the Receiving Waters.

**F.    Defendant's Failure to Comply with the Storm Water Permit's Notice of Intent Requirements.**

159.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to comply with the Storm Water Permit's notice of intent requirements, including the instructions at Attachment 3 ("NOI Instructions"), in violation of Provision E(1).

160.   The Liberty Facility SWPPP, at page 16, states that the Liberty Facility receives and stores "waste fluids, consisting of vehicle fluids such as oil, anti-freeze and used transmission oil . . ." from customers.

161.   Waterkeeper is informed and believes, and thereon alleges, that SIC code

4953 is applicable to the Facility's industrial activities because the Facility receives hazardous waste fluids from customers and stores those fluids at the Facility.

162.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to include in the Liberty NOI all regulated industrial activities occurring at the Liberty Facility, including but not limited to activities covered by SIC code 4953.

163.   The Liberty Site Map included in the Liberty SWPPP states that the size of the Liberty Facility is 55,200 square feet.

164.   The Liberty NOI lists the total size of the Facility as 24,564 square feet.

165.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to accurately state the total size of the Liberty Facility in the Liberty NOI as required by the Storm Water Permit's notice of intent requirements, including the instructions at Attachment 3 ("NOI Instructions"), in violation of Provision E(1).

### G.   The Storm Water Discharges at the Liberty Facility Contain Elevated Levels of Pollutants.

166.   On 8 March 2013, Waterkeeper collected samples of storm water discharges at the Liberty Facility's Discharge Point No. 1.

167.   On 28 February 2014, Waterkeeper collected samples of storm water discharges at the Liberty Facility's Discharge Point No. 1.

168.   On 2 December 2014, Waterkeeper collected samples of storm water discharges at the Liberty Facility's Discharge Point No. 2.

169.   Waterkeeper's samples of storm water discharges collected at the Liberty Facility contain levels of pollutants in excess of EPA Benchmarks. *See* Exhibit A at § II.B.2 (identifying specific storm water samples with TSS, SC, O&G, COD, iron, copper, zinc, magnesium, aluminum, lead, cadmium, selenium, and silver concentrations above EPA Benchmarks).

170.   Waterkeeper is informed and believes, and thereon alleges, that repeated

exceedances of EPA Benchmarks demonstrate that Defendants failed and continue to fail to develop and/or implement required BMPs at the Liberty Facility that achieve compliance with BAT/BCT standards.

171.   Waterkeeper is informed and believes, and thereon alleges, that each time the Liberty Facility discharges storm water the discharges contain levels of pollutants that demonstrate the Liberty Facility Owners' and/or Operators' failure to achieve compliance with BAT/BCT standards. *See* Storm Water Permit, Effluent Limitations B(3).

172.   Samples of storm water discharges collected at the Liberty Facility contain levels of pollutants in excess of WQS. *See* Exhibit A at § II.C (identifying specific storm water samples with copper, zinc, mercury, E. coli, cadmium, and chromium III concentrations above WQS).

173.   Samples of storm water discharges collected at the Liberty Facility contain concentrations of pollutants at levels known to adversely impact aquatic species and the environment. *See* Exhibit A at § II.C.

## H.   Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements.

174.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators commenced industrial operations at the Facility prior to developing a SWPPP.

175.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators commenced industrial operations at the Facility prior to implementing a SWPPP.

176.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators operated the Liberty Facility without a SWPPP for the Facility until on or about 20 May 2014.

177.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to develop a SWPPP for the Liberty Facility that complies with Section A of the Storm Water Permit since obtaining

1    coverage on or about 20 April 2012.

2          178.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

3    Facility Owners and/or Operators failed and continue to fail to implement a SWPPP for

4    the Liberty Facility that complies with Section A of the Storm Water Permit since

5    obtaining coverage on or about 20 April 2012.

6          179.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

7    Facility Owners and/or Operators failed and continue to fail to revise a SWPPP for the

8    Liberty Facility that complies with Section A of the Storm Water Permit.

9          180.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

10   SWPPP fails to include a Pollution Prevention Team that identifies individuals

11   responsible for sampling and visual monitoring as required by Section A(3)(a) of the

12   Storm Water Permit.

13         181.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

14   SWPPP fails to include a Pollution Prevention Team that identifies the individuals

15   responsible for BMP implementation as required by Section A(3)(a) of the Storm Water

16   Permit.

17         182.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

18   SWPPP fails to include a site map of the Liberty Facility that includes points of

19   discharge, outlines of all storm drainage areas with indicators of flow direction in each

20   area, identification of nearby water bodies, municipal storm drain inlets where the

21   Facility's storm water discharges may be received, locations of all storm water collection

22   and conveyance systems, outlines of all impervious areas, locations where materials are

23   directly exposed to precipitation, locations where significant spills or leaks have

24   occurred, and all areas of industrial activity, as required by Section A(4) of the Storm

25   Water Permit.

26         183.   The Liberty SWPPP's Significant Material List, at page 8, only lists "55

27   gallon Used Liquid Oil" and "55 gallons Solid Used Absorbent" as the significant

28   materials stored at the Liberty Facility.

Complaint                                          26

184. The Liberty SWPPP's "Description of Potential Pollutants," at pages 6–7, does not list O&G, SC- and COD-affecting substances, magnesium, aluminum, cadmium, selenium, silver, mercury, E. coli, cadmium, or chromium III as potential pollutants.

185. The Liberty SWPPP's "Description of Potential Pollutants," at pages 6–7, does not identify the Facility's potential pollutants' pollutant sources.

186. The Liberty SWPPP's "Individual BMPs to Control Pollutants," at pages 12–17, does not identify all potential pollutants associated with each pollutant source.

187. The Liberty SWPPP's "Description of Potential Pollutants," at page 6, states that the Liberty Facility conducts a cutting process in the Separation/Dismantling Area, which may result in "small solid pieces" on the floor areas.

188. Neither the Liberty SWPPP's "Description of Potential Pollutants," at page 6, nor the "Individual BMPs to Control Pollutants," at page 15, identifies the pollutant characteristics associated with the cutting process or the quantity of associated materials.

189. The Liberty SWPPP does not include any discussion of the CPU Material identified on the Liberty Site Map.

190. The Liberty SWPPP does not describe potential sources of non-stormwater discharges.

191. Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility's Outdoor Work Area is, at least in part, unpaved.

192. The Liberty SWPPP does not describe the locations where soil erosion may occur as a result of industrial activity or storm water discharges associated with industrial activity.

193. Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to include all significant materials handled or stored at the site and the typical quantities of those materials, including but not limited to metal scraps, anti-freeze and other waste fluids, batteries, alternators, motors, catalytic converters, radiators, water heaters, refrigerators, tires, plastics, and other materials, as required by Sections A(5) and A(6) of the Storm Water Permit.

194.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to include the type, characteristics, and quantities of all significant materials used in or resulting from each industrial process, as required by Section A(6)(a)(i) of the Storm Water Permit.

195.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to include the type, characteristics, and quantities of all significant materials handled or stored at the Facility, as required by Section A(6)(a)(ii) of the Storm Water Permit.

196.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to identify the characteristics of dust and particulate pollutants and the approximate quantity of dust and particulate pollutants that may be deposited within the Facility, as required by Section A(6)(a)(iii) of the Storm Water Permit.

197.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to describe potential sources of non-stormwater discharges, as required by Section A(6)(a)(v) of the Storm Water Permit.

198.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to describe the locations where soil erosion may occur as a result of industrial activity or storm water discharges associated with industrial activity, as required by Section A(6)(a)(vi) of the Storm Water Permit.

199.   The Liberty SWPPP does not identify all potential pollutants corresponding with each likely source of pollution.

200.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty SWPPP fails to include a narrative assessment of all industrial activities and potential pollutant sources in accordance with Section A(7)(a) of the Storm Water Permit.

201.   The Liberty SWPPP does not include a narrative description of the BMPs to be implemented for every potential pollutant and its source.

202.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators fail to include an adequate summary of all BMPs implemented

for each pollutant source in a manner similar to the Storm Water Permit's Table B, as required by Section A(8) of the Storm Water Permit.

203.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators have failed and continue to fail to revise and evaluate the Liberty SWPPP, including the SWPPP's descriptions of potential pollutants, pollutant sources, and industrial processes, as necessary to develop and implement adequate BMPs, as required by Section A(7) of the Storm Water Permit.

204.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all pollutant sources and potential pollutants at the Facility in the SWPPP, the Liberty Facility Owners and/or Operators cannot and have not developed all appropriate BMPs.

205.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all pollutant sources and potential pollutants at the Facility in the SWPPP, the Liberty Facility Owners and/or Operators cannot and have not implemented all appropriate BMPs.

206.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility SWPPP does not include an assessment of the Facility's BMPs corresponding to potential pollutant sources and associated pollutants.

207.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators have failed and continue to fail to assess potential pollutant sources at the Facility.

208.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators have failed and continue to fail to assess the Facility's BMPs corresponding to potential pollutant sources and associated pollutants.

209.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility SWPPP does not include an adequate analysis of the effectiveness of the BMPs at the Facility.

210.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty

Facility Owner and/or Operators have failed and continue to fail to analyze the effectiveness of the BMPs at the Facility.

211.   The Liberty SWPPP's "Individual BMPs to Control Pollutants," at page 12, states that the only existing individual structural BMP associated with the Scrap Metal Pile is the placement of scrap into containers as soon as possible.

212.   Based on Waterkeeper's observations, Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owner and/or Operators regularly fail to cover containers.

213.   The Liberty SWPPP's "Individual BMPs to Control Pollutants," at page 13, states that the Liberty Facility has no individual structural BMPs associated with the Miscellaneous Appliance Storage Area.

214.   The Liberty SWPPP's "Individual BMPs to Control Pollutants," at page 15, states that all separation and dismantling is done outdoors.

215.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility SWPPP does not include adequate structural BMPs to reduce or prevent pollutants in storm water discharges, as required by Section A(8)(b) of the Storm Water Permit.

216.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility SWPPP does not include adequate BMPs to reduce or prevent pollutants in storm water discharges to levels required by the Storm Water Permit.

217.   Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of benchmark levels demonstrate that the Liberty Facility Owners and/or Operators failed and continue to fail to develop BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

218.   Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of benchmark levels demonstrate that the Liberty Facility Owners and/or Operators failed and continue to fail to implement BMPs to prevent the

1  exposure of pollutants to storm water, and to prevent discharges of polluted storm water
2  from the Facility.

3      219.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
4  SWPPP does not include adequate BMPs developed and/or implemented to control non-
5  stormwater discharges.

6  **I.    Defendants' Failure to Comply with the Storm Water Permit's M&RP**
7  **Requirements.**

8      220.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
9  Owners and/or Operators commenced industrial operations at the Facility prior to
10  developing a M&RP.

11      221.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
12  Owners and/or Operators commenced industrial operations at the Facility prior to
13  implementing a M&RP.

14      222.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
15  Owners and/or Operators operated the Liberty Facility without a SWPPP for the Facility
16  until on or about 20 May 2014.

17      223.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
18  Facility Owners and/or Operators failed and continue to fail to develop an adequate
19  M&RP for industrial operations at the Liberty Facility that complies with Section B of
20  the Storm Water Permit since obtaining coverage on or about 20 April 2012.

21      224.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
22  Facility Owners and/or Operators failed and continue to fail to implement an adequate
23  M&RP for industrial operations at the Liberty Facility that complies with Section B of
24  the Storm Water Permit since obtaining coverage on or about 20 April 2012.

25      225.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
26  Facility Owners and/or Operators failed and continue to fail to revise an adequate M&RP
27  for industrial operations at the Liberty Facility that complies with Section B of the Storm
28  Water Permit.

Complaint                                    31

226.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators were obligated under the Storm Water Permit to collect storm water samples during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

227.   Via a Public Records Act request to the Regional Board, Waterkeeper obtained a 2011–2012 Annual Report for the Facility, which was signed and dated by Sindy Cardona on 8 August 2014.

228.   Waterkeeper is informed and believes, and thereon alleges, that the 2011–2012 Annual Report for the Facility, signed and dated by Sindy Cardona on 8 August 2014 (hereinafter referred to as the "2011-2012 Annual Report"), obtained from the Regional Board is the 2011–2012 Annual Report for the Liberty Facility.

229.   Via a Public Records Act request to the Regional Board, Waterkeeper obtained a 2012–2013 Annual Report for the Facility, which was signed and dated by Sindy Cardona on 8 August 2014.

230.   Waterkeeper is informed and believes, and thereon alleges, that the 2012–2013 Annual Report for the Facility, signed and dated by Sindy Cardona on 8 August 2014 (hereinafter referred to as the "2012-2013 Annual Report"), obtained from the Regional Board is the 2012–2013 Annual Report for the Liberty Facility.

231.   Via a Public Records Act request to the Regional Board, Waterkeeper obtained a 2013–2014 Annual Report for the Facility, which was signed and dated by Sindy Cardona on 11 August 2014.

232.   Waterkeeper is informed and believes, and thereon alleges, that the 2013–2014 Annual Report for the Facility, signed and dated by Sindy Cardona on 11 August 2014 (hereinafter referred to as the "2013-2014 Annual Report"), obtained from the Regional Board is the 2013–2014 Annual Report for the Liberty Facility.

233.   The 2011-2012, 2012-2013, and 2013-2014 Annual Reports state that the Liberty Facility Owners and/or Operators failed to conduct any storm water sampling and analysis at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

234.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to conduct any storm water sampling and analysis at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons, as required by Section B(5) of the Storm Water Permit.

235.   The 2011-2012, 2012-2013, and 2013-2014 Annual Reports state that the Liberty Facility Owners and/or Operators failed to conduct any quarterly visual observations at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

236.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to conduct any quarterly visual observations at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons, as required by Section B(3) of the Storm Water Permit.

237.   The 2011-2012, 2012-2013, and 2013-2014 Annual Reports state that the Liberty Facility Owners and/or Operators failed to conduct any monthly Wet Season visual observations at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

238.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to conduct any monthly Wet Season visual observations at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons, as required by Section B(3) of the Storm Water Permit.

239.   The 2011-2012, 2012-2013, and 2013-2014 Annual Reports state that the Liberty Facility Owners and/or Operators failed to conduct any Annual Comprehensive Site Compliance Evaluations ("ACSCE") at the Liberty Facility during the 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

240.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators failed and continue to fail to conduct an ACSCE during each reporting period, as required by Section A(9) of the Storm Water Permit.

241.   The Liberty Facility's M&RP contained in the Liberty SWPPP, at page 20,

Complaint                                    33

1  indicates that the Liberty Facility Owners and/or Operators only intend to analyze storm
2  water samples for TSS, pH, SC, O&G or TOC, zinc, lead, copper, and COD.

3      242.   The Liberty Facility's M&RP contained in the Liberty SWPPP, at page 20,
4  fails to include aluminum and iron as parameters for which samples will be analyzed as
5  part of the M&RP.

6      243.   The Liberty Facility's M&RP contained in the Liberty SWPPP, at page 20,
7  fails to include ammonia, magnesium, arsenic, cadmium, cyanide, mercury, silver, and
8  selenium as parameters for which samples will be analyzed as part of the M&RP.

9      244.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
10  Facility's M&RP fails to include all analytical parameters associated with SIC code 5093
11  as provided in Table D of the Storm Water Permit, as required by Section B(5)(c)(iii) of
12  the Storm Water Permit.

13      245.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
14  Facility's M&RP fails to include all analytical parameters associated with SIC code 4953
15  as provided in Table D of the Storm Water Permit, as required by Section B(5)(c)(iii) of
16  the Storm Water Permit.

17      246.   The Liberty Facility's M&RP contained in the Liberty SWPPP does not
18  provide for sampling to identify any toxic chemicals or other pollutants that are likely to
19  be present in storm water discharges in significant quantities.

20      247.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
21  Facility's M&RP fails to include for sampling to identify any toxic chemicals or other
22  pollutants that are likely to be present in storm water discharges in significant quantities,
23  as required by Section B(5)(c)(ii) of the Storm Water Permit.

24      248.   The Liberty Facility's M&RP contained in the Liberty SWPPP, at page 20,
25  identifies the two discharge point locations from which the Liberty Owners and/or
26  Operators will collect storm water samples as "Northwest Gate" and "Southwest Gate."

27      249.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty
28  Facility does not have any gates in the northwest portion of the Facility.

Complaint                                 34

250.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility does not have any gates in the southeast portion of the Facility.

251.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility has a discharge point located at the Facility's southernmost driveway at Alba Street, near the middle of the Facility's eastern boundary.

252.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility discharges storm water from a point underneath the Facility's eastern wall bordering Alba Street, south of the Facility's southernmost driveway at Alba Street.

253.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility's M&RP fails to incorporate monthly storm water visual observations at all discharge locations, as required by Section B(4)(a) of the Storm Water Permit.

254.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility's M&RP fails to incorporate sampling and analysis of storm water discharges from all discharge locations, as required by Section B(5)(a) of the Storm Water Permit.

**J.     Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements.**

255.   The 2011-2012 Annual Report was submitted on or after 8 August 2014.

256.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators failed to submit the 2011–2012 Annual Report on or before 1 July 2012, as required by Section B(14) of the Storm Water Permit.

257.   The 2012-2013 Annual Report was submitted on or after 8 August 2014.

258.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators failed to submit the 2012–2013 Annual Report on or before 1 July 2013, as required by Section B(14) of the Storm Water Permit.

259.   The 2013-2014 Annual Report was submitted on or after 11 August 2014.

260.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators failed to submit the 2013–2014 Annual Report on or before 1 July 2014, as required by Section B(14) of the Storm Water Permit.

261.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Facility Owners and/or Operators failed and continue to fail to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

262.   The 2011-2012 Annual Report states that the Liberty Facility only has one storm water discharge location.

263.   The 2012-2013 Annual Report states that the Liberty Facility only has one storm water discharge location.

264.   The 2013-2014 Annual Report states that the Liberty Facility only has one storm water discharge location.

265.   Waterkeeper is informed and believes, and thereon alleges, that each of the Facility's 2011-2012, 2012-2013, and 2013-2014 Annual Reports inaccurately state that the Liberty Facility only has one storm water discharge location.

266.   Waterkeeper is informed and believes, and thereon alleges, that the Liberty Owners and/or Operators have continuously falsely certified the accuracy of the Liberty Facility's Annual Reports, in violation of Section B(14) of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendants' Failure to Submit an NOI that Complies with the Storm Water Permit's NOI Instructions in Violation of the Storm Water Permit's Provision E(1) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

267.   Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

268.   Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to comply with the Storm Water Permit's NOI Instructions, in violation of Provision E(1).

269.   Defendants have been in violation of Provision E(1) of the Storm Water Permit every day since at least 20 April 2012 for failing to submit an NOI for the Liberty Facility that complies with the NOI Instructions.

Complaint                                              36

270.   Waterkeeper is informed and believes, and thereon alleges, that Defendants' violations of the Storm Water Permit's Provision E(1) and the Clean Water Act are ongoing and continuous.

271.   Defendants will continue to be in violation of the Storm Water Permit's Provision E(1) and the Clean Water Act each and every day they operate the Liberty Facility without complying with the Storm Water Permit's NOI Instructions.

272.   Each and every day Defendants operate the Liberty Facility in violation of Provision E(1) of the Storm Water Permit is a separate and distinct violation of the Clean Water Act.

273.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since 20 April 2012.

274.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

### SECOND CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

275.   Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

276.   Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities in the Liberty Facility discharges to levels that, through the development of BMPs, achieve BAT/BCT.

277. Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities in the Liberty Facility discharges to levels that, through the implementation of BMPs, achieve BAT/BCT.

278. Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards is discharged from the Liberty Facility each time storm water discharges from the Liberty Facility.

279. Defendants violate Effluent Limitation B(3) of the Storm Water Permit each and every time storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards is discharged from the Liberty Facility.

280. Waterkeeper is informed and believes, and thereon alleges, that Defendants' violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

281. Defendants will continue to violate the Storm Water Permit and the Clean Water Act each and every time contaminated storm water discharges from the Liberty Facility in violation of Effluent Limitation B(3) of the Storm Water Permit.

282. Each and every time Defendants discharge contaminated storm water from the Liberty Facility in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

283. Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since 20 April 2012.

284. An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no

plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(1) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

285.   Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

286.   Waterkeeper is informed and believes, and thereon alleges, that Defendants discharged and continue to discharge storm water containing levels of pollutants that adversely impact human health and/or the environment from the Liberty Facility.

287.   Waterkeeper is informed and believes, and thereon alleges, that each time storm water is discharged from the Liberty Facility it contains levels of pollutants that adversely impact human health and/or the environment.

288.   Defendants violate Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the Liberty Facility.

289.   Waterkeeper is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

290.   Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the Liberty Facility in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

291.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

292.   Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above,

Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since 20 April 2012.

293.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(2) and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

294.   Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

295.   Waterkeeper is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water containing levels of pollutants from the Liberty Facility that cause or contribute to exceedances of water quality standards.

296.   Waterkeeper is informed and believes, and thereon alleges, that each time storm water is discharged from the Liberty Facility it contains levels of pollutants that cause or contribute to exceedances of water quality standards.

297.   Defendants violate Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges from the Liberty Facility.

298.   Waterkeeper is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(2) of the Storm Water Permit and Clean Water Act are ongoing and continuous.

299.   Each and every violation of Receiving Water Limitation C(2) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

§ 1311(a).

300. Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since 20 April 2012.

301. An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

302. Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

303. Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop a SWPPP for the Liberty Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

304. Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement a SWPPP for the Liberty Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

305. Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise a SWPPP for the Liberty Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

306. Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit for failing to develop, implement, and/or revise an adequate SWPPP

Complaint                                      41

1  for the Liberty Facility every day since at least 20 April 2012.

2      307.   Defendants' violations of Section A and Provision E(2) of the Storm Water

3  Permit and the Clean Water Act are ongoing and continuous.

4      308.   Defendants will continue to be in violation of Section A and Provision E(2)

5  of the Storm Water Permit and the Clean Water Act each and every day Defendants

6  operate the Liberty Facility without an adequately developed, implemented, and/or

7  revised SWPPP for the Liberty Facility.

8      309.   Each and every violation of the Storm Water Permit's SWPPP requirements

9  at the Liberty Facility is a separate and distinct violation of the Clean Water Act.

10      310.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§

11  1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

12  above, Defendants are subject to an assessment of civil penalties for each and every

13  violation of the Clean Water Act since 20 April 2012.

14      311.   An action for injunctive relief under the Clean Water Act is authorized by 33

15  U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

16  irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no

17  plain, speedy, or adequate remedy at law.

18      WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth

19  hereafter.

## SIXTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

24      312.   Waterkeeper incorporates the allegations contained in the above paragraphs

25  and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

26      313.   Waterkeeper is informed and believes, and thereon alleges, that Defendants

27  failed and continue to fail to adequately develop an M&RP for the Liberty Facility, in

28  violation of Section B and Provision E(3) of the Storm Water Permit.

314.   Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement an M&RP for the Liberty Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

315.   Waterkeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise an M&RP for the Liberty Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

316.   Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit for their failure to develop, implement, and/or revise an adequate M&RP for the Liberty Facility every day since at least 20 April 2012.

317.   Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

318.   Defendants will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the Clean Water Act each and every day Defendants operate the Liberty Facility without an adequately developed, implemented, and/or revised M&RP for the Liberty Facility.

319.   Each and every violation of the Storm Water Permit's M&RP requirements at the Liberty Facility is a separate and distinct violation of the Clean Water Act.

320.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since 15 October 2009.

321.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

/ / /

Complaint                                          43

## SEVENTH CAUSE OF ACTION

**Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements in Violation of the Storm Water Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

322.   Waterkeeper incorporates the allegations contained in the above paragraphs and in the Notice Letter, attached as Exhibit A, as though fully set forth herein.

323.   Waterkeeper is informed and believes, and thereon alleges, that Defendants' Annual Reports have not met the reporting requirements of the Storm Water Permit, in violation of Section B(14) of the Storm Water Permit.

324.   Waterkeeper is informed and believes, and thereon alleges, that Defendants' failed and continue to fail to timely submit any Annual Reports by July 1 of each year, in violation of Section B(14) of the Storm Water Permit.

325.   Defendants have been in violation of the reporting requirements of the Storm Water Permit each day they have operated the Liberty Facility without reporting as required by Section B(14) of the Storm Water Permit.

326.   Defendants have been in daily and continuous violation of Section B(14) of the Storm Water Permit every day since at least 20 April 2012.

327.   Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

328.   Defendants will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every day Defendants operate the Liberty Facility without complying with the Storm Water Permit's reporting requirements.

329.   Each and every violation of the Storm Water Permit's reporting requirements at the Liberty Facility is a separate and distinct violation of the Clean Water Act.

330.   Pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA since 20 April 2012.

331.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and its members, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Waterkeeper prays for judgment against Defendants as set forth hereafter.

## VII.   RELIEF REQUESTED

332.   Waterkeeper respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendants to have violated and to be in violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their violations of the substantive and procedural requirements of the Storm Water Permit;

b.   A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.   A Court order assessing civil monetary penalties for each violation of the Clean Water Act at $37,500 per day per violation for violations occurring since 20 April 2012, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

d.   A Court order awarding Waterkeeper its reasonable costs of this suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

e.   Any other relief as this Court may deem appropriate.

Dated: June 8, 2015                    Respectfully submitted,

LAWYERS FOR CLEAN WATER, INC.


_____/s/ Drevet Hunt_____
Drevet Hunt
Attorney for Plaintiff
Los Angeles Waterkeeper

Complaint                         45